[Docket No. 2]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| JANE DOE, in her individual capacity,<br><br>Plaintiff,<br><br>v.<br><br>ROWAN UNIVERSITY and Dr. JEFFREY GREESON, in his individual and official capacities,<br><br>Defendants. | Civil No. 23-20657 (RMB-MJS)<br><br>**OPINION** |

**APPEARANCES**

Montgomery Law, PLLC
Bradley R. Flynn, Esq.
1420 Locust Street, Suite 420
Philadelphia, Pennsylvania 19102

    *On behalf of Plaintiff*

Saul Ewing LLP
James A. Keller, Esq.
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102

    *On behalf of Defendants*

**RENÉE MARIE BUMB, Chief United States District Judge**

This matter comes before the Court upon Plaintiff Jane Doe's Motion for a

Temporary Restraining Order and Preliminary Injunction against Defendants

Rowan University and Doctor Jeffrey Greeson, in his individual and official

capacities. For the reasons set forth below, Plaintiff's Motion for a Temporary Restraining Order is denied. Plaintiff's Motion for a Preliminary Injunction will be stayed pending the completion of expedited discovery. Following completion of expedited discovery, the Court will hold a hearing on Plaintiff's Motion for a Preliminary Injunction and adjudicate the claims accordingly.

## I.    FACTUAL BACKGROUND

Plaintiff Jane Doe[1] is a PhD student at Rowan University in the Department of Clinical Psychology. [Compl. ¶ 24.] She alleges that between August 2019 and January 2021, she was subjected to repeated sexual harassment by her professor and mentor, Dr. Jeffrey Greeson. [Compl. ¶ 27.] Specifically, Plaintiff alleges that Dr. Greeson repeatedly asked her out on dates to lunch, dinner, and late-night drinks, and would forcibly hug Plaintiff without her consent while they were alone in his office with the door shut. [Compl. ¶ 27–29.] Plaintiff alleges that when she told Dr. Greeson in July 2021 that she planned on leaving his lab due to his repeated advances, Dr. Greeson responded by telling Plaintiff that if she left his lab, he "would do everything in [his] power to get [her] dismissed" from the PhD program. [Compl. ¶ 31.][2]

---

[1] The Court notes that parties to a lawsuit generally must identify themselves in their pleadings and seek leave of Court to proceed anonymously. *See* FED. R. CIV. P. 10(a); *Doe v. Schwerzler*, 2007 WL 1892403, at *3 (D.N.J. June 28, 2007). Plaintiff is ordered to file an appropriate motion requesting such relief.
[2] Dr. Greeson is subject to a no-contact order against Plaintiff. [Compl. ¶ 40.]

As part of the University's clinical psychology graduate program, students must pass certain program benchmarks, including a qualifying PhD examination (the "Qualifying Exam"). [*See* Unsworn Declaration of Dr. Jim Haugh ¶ 4–5 ("Haugh Decl."); Affidavit of Jane Doe in Support of her Motion for a Temporary Restraining Order and a Preliminary Injunction ¶ 12 ("Doe Aff.").] To pass the Qualifying Exam and matriculate within the program, a PhD student must receive passing marks across seven different content areas. [*See* Haugh Decl., Ex. 6 at 54–56.] If a PhD student fails four or more content areas, the student is deemed to have failed the entire exam and must re-take the exam at the next available testing date. [*Id.* at 55.] A student who fails the Qualifying Exam in part or entirely twice will be dismissed from the program. [*Id.*] The exams are blindly graded. [*Id.* at 54.]

On October 25, 2021, the Department notified Plaintiff that she failed her first attempt at the Qualifying Exam. [*See* Haugh Decl., Ex. 5.] Because she passed only four of the seven content areas, she would have to re-take the entirety of the Qualifying Exam. [*Id.*] On August 16 and 18, 2022, Plaintiff re-took the Qualifying Exam. [Compl. ¶ 34.] She failed, only passing six of the seven content areas. [*Id.*] The only section she failed—Integrated Health—was a section that Dr. Greeson (and another professor) scored. [*Id.*][3] This issue was later addressed by the Department as discussed below.

_____

[3] Plaintiff alleges that the second exam grader is "known to be a close colleague and collaborator with Defendant Greeson." [Compl. ¶ 9 n.2.]

Importantly, Plaintiff's struggles with the Qualifying Exam were not the first time she had difficulty with program benchmarks. Since 2020, Plaintiff has been on academic probation. [Haugh Decl. Ex., 3.] While Plaintiff has excellent coursework grades and some strong evaluations, [*See* Compl. ¶ 1; Pl.'s Br., Exs. C–I], she failed her (i) First Year Research Project (twice); (ii) Master's Defense Thesis and (iii) her Case Conceptualization Benchmark—an oral presentation based on practicum experience. [*See* Haugh Decl., Exs. 1, 4, 7.][4] While Plaintiff ultimately passed both her First Year Research Project and Master's Defense Thesis, [Haugh Decl. ¶ 10–11], she has not yet passed her Case Conceptualization Benchmark. [Haugh Decl. ¶ 19.] Like the Qualifying Exam, if a PhD student fails the Case Conceptualization Benchmark in part or entirely twice, she will be dismissed from the program. [*See* Haugh Decl., Ex. 6 at 30.]

On October 6, 2022, Plaintiff timely appealed her second failure of the Qualifying Exam. [Compl. ¶ 37.] Plaintiff's appeal included a request that Dr. Greeson be excluded from the appeal process and to "throw[] out" Dr. Greeson's grade from her failed Qualifying Exam section. [Haugh Decl., Ex. 11 at 1.] Four days after filing her appeal—and nearly two years after Plaintiff alleges that Dr. Greeson's harassing behavior ended—Plaintiff filed a Title IX complaint against Dr.

---

[4] Plaintiff mentions none of these failures in her pleading. After they were raised by Defendants in their opposition brief, she averred in a "counter affidavit" attached to her reply brief that she failed these benchmarks—also graded by Dr. Greeson— because she turned down Dr. Greeson's advances. *See* Counter Affidavit of Jane Doe in Further Support of her Motion for a Temporary Restraining Order and Preliminary Injunction ¶ 9 ("Doe Counter Aff.").

4

Greeson. [Compl. ¶¶ 10, 37; Haugh Decl., Ex. 9.] The University's Title IX investigation remains ongoing. [Compl. ¶ 41.][5]

On July 11, 2023, Dr. Jim Haugh, the program's Director of Clinical Training, sent a letter to Plaintiff regarding the status of her Qualifying Exam grade appeal. [Haugh Decl., Ex. 11.] Dr. Haugh's letter acknowledged that the Department had honored her request to exclude Dr. Greeson's grade, and that two new graders had re-scored Plaintiff's Integrated Health section. [*Id*. at 1.] After re-grading, Plaintiff still failed the Integrated Health section of the Qualifying Exam. [*Id*. at 1–2.] Nonetheless, Dr. Hough agreed to let Plaintiff's appeal continue. [*Id*. at 2.] Dr. Greeson would not take part in the appeal process. [*Id*.]

The Department's Clinical Training Committee heard Plaintiff's appeal on August 10, 2023, and voted to deny it on August 11, 2023. [Compl. ¶ 57; Haugh Decl., Ex. 12.] The Clinical Training Committee informed Plaintiff that she could take a second appeal to the Dean of the College of Science and Mathematics and that any decision regarding her dismissal would be put on hold pending the outcome of that second appeal. [Haugh Decl., Ex. 12 at 1.] Plaintiff elected to pursue the appeal. [Compl. ¶ 57.]

On August 23, 2023, the Clinical Training Committee informed Plaintiff that based on the outcome of her appeal and her continuing probationary status in the program, she was required to cease all program-related activities including teaching,

---

[5] The Title IX investigators recently submitted a final report to the University and will be scheduling a formal Title IX hearing. [Defs.' Br. at 8.]

taking courses, and applying for her fall internship, unless and until she prevailed on appeal before the Dean. [Haugh Decl., Ex. 13 at 1.] Plaintiff alleges that if she does not apply for a fall internship by October 2023, she will have to repeat another year in the PhD program. [Compl. ¶¶ 63, 70; Doe Aff. ¶ 3.]

On September 8, 2023, a committee from the Dean's office heard Plaintiff's appeal of her Qualifying Exam grade. [Compl. ¶ 58.] On September 21, 2023, Dr. Elisabeth Morlino, Associate Dean for Academics and Research Affairs, informed Plaintiff that her appeal was denied. [Haugh Decl., Ex. 14 at 1.] Dr. Morlino explained that the Dean's Committee considered Plaintiff's allegations of misconduct against Dr. Greeson but "found no evidence that the score on the second attempt ... was comprised in any way" given the blind grading system. [*Id.* at 2.]

Having twice failed the Qualifying Exam and unsuccessful in her appeals, Dr. Haugh informed Plaintiff that she was dismissed from the Clinical Psychology PhD program but had the right to appeal the dismissal decision with the Dean's office within ten business days. [Haugh Decl., Ex. 15.][6] The Clinical Psychology Department's Program Handbook makes clear that a student is finally dismissed only after the Dean decides the appeal or a student decides not to appeal the Department-level dismissal. [Haugh Decl., Ex. 6 at 91.] As of the date of this Opinion, it is not clear whether Plaintiff has formally taken an appeal of her

---

[6] Dr. Hough's letter, although dated September 26, was delivered to Plaintiff on September 27. [*See* Defs.' Br. at 8.] Accordingly, Plaintiff's deadline to appeal her dismissal is October 12, 2023, in light of the October 9 Columbus Day Holiday.

dismissal but all of the evidence submitted indicates that she plans to do so. .
[Compl. ¶ 16; Defs.' Br. at 8; Pl.'s Reply at 2, 7; Doe Counter Aff. ¶ 6.]

## II.    PROCEDURAL BACKGROUND

On September 25, 2023—two days before learning that she was dismissed pending appeal—Plaintiff filed suit in this Court and simultaneously moved for a temporary restraining order and preliminary injunction against the University and Dr. Greeson. [*See* Docket Nos. 1–3.] Defendants filed an opposition brief on September 29, 2023 [*See* Docket No. 9.] Plaintiff filed a reply brief on October 6, 2023. [*See* Docket No. 11.] Only Plaintiff's claims of Title IX sex/gender discrimination, Title IX retaliation and violation of the New Jersey Law Against Discrimination ("NJLD") are at issue in her Motion. [*See* Docket No. 2 at 8 n.1.][7]

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders and preliminary injunctions. A Plaintiff must satisfy four familiar requirements in order to obtain injunctive relief:

(1) a reasonable probability of eventual success in the litigation, and
(2) that [they] will be irreparably injured ... if relief is not granted....
[In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

---

[7] In addition to these claims, Plaintiffs alleges (i) denials of due process and equal protection, and negligent hiring, retention, and training against the University, [*see* Compl. ¶¶ 104–24, 146–55]; and (ii) intentional infliction of emotional distress, against the University and Dr. Greeson [Compl. ¶¶ 141–45].

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26,

2017) (citing *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917,

919–20 (3d Cir. 1974) (citations omitted)). The Third Circuit has made clear that

"[p]reliminary injunctive relief is 'an extraordinary remedy' and 'should be granted

only in limited circumstances.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708

(3d Cir. 2004) (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42

F.3d 1421, 1427 (3d Cir. 1994)). Temporary restraining orders have the same

requirements as preliminary injunctions and are "stay-put orders ... designed to

maintain the status quo during the course of proceedings. They 'function[], in

essence as an automatic preliminary injunction.'" *J.O. ex rel. C.O. v. Orange Twp. Bd.

of Educ.*, 287 F.3d 267, 272 (3d Cir. 2002) (quoting *Drinker v. Colonial Sch. Dist.*, 78

F.3d 859, 864 (3d Cir. 1996)).

## IV.   ANALYSIS

### A.   Likelihood of Success on the Merits

#### 1.   *Title IX quid pro quo Claim*

The evidence submitted demonstrates that Plaintiff is unlikely to succeed on

her Title IX *quid pro quo* claim. Unwelcome sexual advances or verbal or physical

actions of a sexual nature constitute *quid pro quo* harassment under Title IX when

either "(A) the plaintiff's submission to that conduct is made either explicitly or

implicitly a term or condition of her education or employment experience in a

federally-funded education program, or (B) submission to or rejection of that conduct

is used as the basis for [an] education … decision[] that affect[ed] the plaintiff." *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 565 (3d Cir. 2017) (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 27 (3d Cir. 1997)). Additionally, a Title IX plaintiff alleging *quid pro quo* harassment must show deliberate indifference by an 'official who at a minimum' had 'authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf,' had 'actual knowledge of discrimination in the recipient's programs,' and failed adequately to respond." *Mercy Cath. Med. Ctr.*, 850 F.3d at 565–66 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

Here, and as Plaintiff admits, University officials are fully aware of her Title IX complaint and are taking appropriate steps to address it through the pending investigation. [Compl. ¶¶ 12, 38, 41, 63; Doe Aff. ¶ 15.] And once Plaintiff made the University aware of her concerns that Dr. Greeson failed Plaintiff as retaliation for rejecting his unwanted advances, the Department threw out that Qualifying Exam score and had two completely new graders blindly re-score Plaintiff's failed section. [Haugh Decl., Ex. 11 at 1.] Still, Plaintiff failed. [*Id.*] It is also for that reason that Plaintiff cannot likely show that her rejection of Dr Greeson's alleged conduct was the basis for her asserted adverse educational action (i.e., failure of the Qualifying Exam)—Plaintiff appears to have failed the Qualifying Exam every which way.[8]

---

[8] Plaintiff's argument that the University was deliberately indifferent by excluding her participation in the program lacks merit. [Pl.'s Reply at 5.] It is likely that Plaintiff cannot show that the University's response to the alleged sexual harassment was "clearly unreasonable in light of the known circumstances." *Doe v. Princeton*

## 2.    *Title IX Retaliation Claim*

Plaintiff is also unlikely to succeed on her Title IX retaliation claim. To make out a *prima facie* retaliation case under Title IX, a Plaintiff "must prove she engaged in activity protected by Title IX, [] suffered an adverse action, and there was a causal connection between the two." *Mercy Cath. Med. Ctr.*, 850 F.3d at 564. Upon establishing a *prima facie* retaliation claim, the burden shifts to the defendant to show a legitimate, nonretaliatory reason for its conduct. *Id*. If the defendant can make such a showing, the burden shifts again to the Title IX plaintiff to demonstrate why the offered nonretaliatory reason is pretextual. *Id*.

Here, Plaintiff is unlikely to establish a *prima facie* retaliation case because there is a weak nexus between the protected activity (the filing of her Title IX complaint) and the alleged adverse action (her second failure of the Qualifying Exam). Plaintiff alleges that the harassing conduct by Dr. Greeson took place between August 2019 and January 2021 and that as a result of her outward rejections of that harassing conduct, Dr. Greeson failed Plaintiff under blind grading conditions well over a year later in August 2022. [Compl. ¶¶ 9–10, 27.] But those allegations are

---

*Univ.*, 2018 WL 2396685, at *5 (D.N.J. May 24, 2018), *aff'd*, 790 F. App'x 379 (3d Cir. 2019) (quoting *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)). Indeed, the University followed its usual procedures in denying Plaintiff's participation in the program. [*See, e.g.*, Haugh Decl., Ex. 6 at 88 ("Dismissal is usually *effective immediately* and would prohibit registration for any future term. *If any registration for a future term was already performed, it would be dropped by Rowan Global and the student will be made "inactive" in the system.*") (emphases added); *see also id*. at 85–86.]

backwards for the purposes of a Title IX retaliation claim. Plaintiff would have to show that *because of* her Title IX complaint against Dr. Greeson, the University took adverse action against her. *Cf. Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) (explaining in Title VII burden shifting context that a plaintiff must show that their employer took an adverse action against them *because of* a protected characteristic). Here, Plaintiff can show an adverse action and a protected activity, but she likely cannot show that the protected activity caused the adverse action since the adverse action took place before she engaged in the protected activity.

Plaintiff argues that the adverse action following the filing of her Title IX complaint was the University preventing Plaintiff from accessing the benefits of the program before her Qualifying Exam grade appeal was final. [Reply Br. at 8.] But again, the University was simply following its own procedures. As the Program Handbook makes clear, a student will be placed on probation following a failure of the Qualifying Exam. [*See* Haugh Decl., Ex. 6 at 86.] And once a student is on probation, she:

> "may not be permitted to begin a practicum, participate in the Clinical Competency or Qualifying Exams, apply for Internship, or register for Dissertation credit ***until their probationary status has been resolved. Students may also be prohibited from engaging in other programmatic work (e.g., engaging in practicum) depending on the nature and reason of the probation.*** Probationary status may also affect eligibility for financial aid, assistantships, fellowships, and scholarships. ***Decisions regarding students moving forward while on probation will be made by the DCT in consultation with the CTC, Department Head/Chair, the College Dean and other appropriate constituencies.***

11

*Id.* at 85–86 (emphases in original). In other words, there appears to be nothing unusual with the University taking certain steps to remove program benefits from Plaintiff in light of her probationary status.

Further, there is an abundance of evidence—that Plaintiff failed to mention in a pleading subject to Federal Rule of Civil Procedure 11—supporting a conclusion that the only reason that the University dismissed Plaintiff was that she was unqualified. She failed her First Year Research Project (twice), her Case Conceptualization Benchmark (which she must still pass to remain in the program), and her Master's Defense thesis. [*See* Haugh Decl., Exs. 1, 4, 7.] This is all in addition to failing her blindly graded Qualifying Exam twice and the blindly re-graded Integrated Health section of her Qualifying Exam. [Haugh Decl., Ex. 11 at 1.]. Accordingly, Plaintiff's identified pretext that she is a strong student in the classroom does not convince the Court that she is likely to succeed on her retaliation claim.[9]

### 3.   *NJLAD Claim*

Finally, Plaintiff has failed to show a likelihood of success on her NJLAD claim. Plaintiff argues that because she is likely to prevail on her claims for Title IX discrimination and retaliation, she will also prevail on her NJLAD claims. [Pl.'s Br.

---

[9] Nor do the other pretexts identified by Plaintiff convince the Court of her likelihood of success. Plaintiff *was not* dismissed before the University decided her grade appeal, [*see* Hough Decl., Ex. 15], and 34 C.F.R. 106.71 does not prevent a school from dismissing pending a Title IX investigating for legitimate nonretaliatory purposes.

at 12–13.] Therefore, the Court finds that Plaintiff has failed to show a likelihood of success on her NJLAD claim for the same reasons identified above.

### B.    Irreparable Harm

Plaintiff cannot show that it is more likely than not that she will face irreparable harm absent a temporary restraining order. "[T]o demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). It is not enough for the harm to be "serious or substantial, .... [I]t must be of a peculiar nature, so that compensation in money cannot atone for it." *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). The moving party must also "make a clear showing of *immediate* irreparable harm." *Campbell Soup Co.*, 977 F.2d at 91 (emphasis in original).

Plaintiff argues that she is suffering irreparable harm because the University is abridging her constitutional rights by dismissing her prior to adjudicating her Title IX complaint. [Pl.'s Br. at 14.]. But as Plaintiff admits, she has not been finally dismissed and still has a right to appeal her dismissal. [*See* Haugh Decl., Ex. 6 at 91; Pl.'s Reply at 6.] There is nothing immediate, final, or certain about the outcome of that appeal. Plaintiff may be reinstated or not. If she is reinstated, there will be no harm. And if she is not reinstated, there is still no indication that she would be "unable to participate in [the Title IX] process," which may also provide her with the relief she seeks. [Pl.'s Br. at 14.] The availability of these additional means of internal

administrative relief necessarily means that any harm Plaintiff faces is not irreparable.

Even if the Title IX and dismissal appeal processes are decided against Plaintiff or are somehow futile, Plaintiff has alternative legal and equitable remedies following a trial in this action. If she is successful in prosecuting her underlying claims, she may be reinstated by the University and permitted to complete her PhD, and/or compensated with money damages. [*See* Compl. at Prayer for Relief.] And if she is successful, she will have at most, suffered a delay in her education which is a genuine injury, but not an irreparable one. *See Doe v. Princeton Univ.*, 2020 WL 2097991, at *7 (D.N.J. May 1, 2020) (delay in education not an irreparable harm); *Doe v. Univ. of Scis.*, 2020 WL 5211028, at *4 (E.D. Pa. Sept. 1, 2020) (same); *Knoch v. Univ. of Pittsburgh*, 2016 WL 4570755, at *8 (W.D. Pa. Aug. 31, 2016) (same).[10]

## C.  Balance of the Equities and the Public Interest

The Court briefly addresses the third and fourth factors and finds that they both weigh against imposing a temporary restraining order. *See Reilly*, 858 F.3d at 176 (explaining that where a Plaintiff fails to demonstrate a likelihood of success on the merits or irreparable harm—the two "most critical" "gateway" factors, the court need not address remaining factors). Denying Plaintiff's Motion for temporary relief will leave the parties no worse off: Plaintiff still will have both her Title IX and

---

[10] For the same reason, Plaintiff's inability to apply for fall internships by October 2023 is likely not irreparable. As she acknowledges, failing to apply for fall internships will only delay her education. [Doe Aff. ¶ 9.] That delay would be redressable through monetary damages.

14

appeal remedies available to her. But if the Court grants Plaintiff's Motion, the Court is effectively acting as a super-administrator for the University deciding its internal processes for it. That is both inequitable and against the public interest. The Court declines to serve that function.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Temporary Restraining Order is **DENIED**. An accompanying Order shall issue.


October 10, 2023                          s/Renée Marie Bumb
Date                                      RENÉE MARIE BUMB
                                         Chief United States District Judge